Frank A. Gulotta, J.
 

 The defendant Paulgene Realty Corporation is the owner of a 15-acre plot situated in the Village of Brookville on which the defendant, Robin Hood Country Day School, Inc., operates a private nursery-kindergarten school for
 
 *791
 
 cbildren from ages 3 to 5 and a country day school for children from ages 4 to 14, pursuant to a provisional charter dated June 27, 1958, granted to it by the University of the State of Hew York, in accordance with sections 216 and 217 of the Education Law. The individual defendants are officers, directors and sole stockholders of both corporations and direct the operation of Robin Hood Country Day School.
 

 The plaintiff village brings this action for an injunction to restrain the continuance of defendants’ operations. It is claimed, first, that the Robin Hood School is in fact a day camp and as such violates the zoning ordinance of the plaintiff, and secondly, that even if it is a bona fide school, it does not comply with numerous provisions of both the zoning ordinance and the building code which were recently amended in a manner apparently calculated to legislate the defendant out of existence. The defendants’ counterclaim for a declaratory judgment puts in issue the validity of that ordinance and code.
 

 Parenthetically, it may be observed that since this is an action in equity, the issues will be decided on the basis of the situation existing at the time of trial although some very significant and important events have taken place since the action was commenced in May, 1959, including plaintiff’s amendment of its zoning ordinance and building code on September 14, 1959, and July 27, 1959, respectively, and defendant’s revision of its curriculum so as to reverse its 1958
 
 Summer
 
 season proportion of 70% physical education and 30% academic education to a 1959 apportionment of time, which was just the reverse of that.
 
 (Bloomquist
 
 v.
 
 Farson,
 
 222 N. Y. 375;
 
 Lightfoot
 
 v.
 
 Davis,
 
 198 N. Y. 261;
 
 Matter of Galewitz,
 
 3 A D 2d 280.)
 

 The evidence adduced before this court on the first issue overwhelmingly establishes the status of the defendant Robin Hood Country Day School to be that of a school. Outstanding educators of unimpeachable integrity, including Dr. Warren W. Knox, the Assistant Commissioner of Education of the State of Hew York, and Dr. Gordon McKenzie, the director of the Department of Currículum and Teaching at Teachers College, Columbia University, so testified.
 

 In addition, it appears the defendant, Eugene Roberts, who is the supervisor and director of the Robin Hood program, holds a Bachelor of Science degree, a Master of Arts degree, and has completed courses equivalent to a degree of Doctor of Philosophy in Science Education. He has been and still is a licensed teacher and assistant principal in the Hew York City school system. The defendant, Paula Roberts, his wife, who assists him, holds a Bachelor of Arts degree, has specialized in psychol
 
 *792
 
 ogy and elementary education and guidance, and has taught in the New York City and Nassau County schools. During the Summer of 1959 the staff consisted of 23 teachers, each duly licensed to teach by the State of New York or the City of New York. These teachers had 46 assistants all of whom, with the exception of three, were college students. A teacher and two assistants were assigned to each class of some 25 students. An additional six members of the faculty were specialists in the field of science, music, language arts, industrial arts and crafts, social studies and physical education, each a duly licensed teacher presently practicing his or her profession and each holding various college degrees. A nurse and two office girls were likewise always in attendance.
 

 During the first week of June, 1959, defendant Eugene Boberts, one Abraham Scharf, who was an assistant principal, and some of the specialists worked on and prepared a new curriculum for the 1959 Summer session. A separate program was developed for each of the 23 classes. To a large extent these programs followed recommended courses of study as laid down by the New York City and New York State Departments of Education and provided for approximately 70% of the students ’ time to be spent in classical and nature study and education, and about 30% in directed and supervised physical activities. This program was mailed to every prospective enrollee and a consent thereto in writing was procured from the parent. The child was placed in a class which would assist in preparing him for the grade he was to enter the following September. Books were purchased and distributed for study; achievement tests were given; skills and drills were given to the younger children; examinations were conducted; records of each child were kept; reports were made to parents; special work in the field of remedial reading and other fields was carried on; and weekly reports of activities were made by the teachers. Innumerable exhibits were received in evidence which, together with the oral testimony, establish beyond any doubt that the activities of Bobin Hood constitute a school within the traditional meaning of that term.
 

 In short, the defendant has the three prime requisites which all the experts who testified agree are essential to make up a school: a curriculum, a plant consisting of adequate physical facilities, and a qualified staff to carry into effect its educational objectives.
 

 Supervised physical training and instruction by competent personnel is nonetheless educational because it trains the body as well as the mind. What the proportion must be between the
 
 *793
 
 two types of education, in order to qualify a school for the preferred position accorded private schools to carry on their operations in a residence zone under the decision in
 
 Matter of Diocese of Rochester
 
 v.
 
 Planning Bd. of Town of Brighton
 
 (1 N Y 2d 508), I am not called upon to decide. Suffice it to say that the 1959 proportion, which the defendants say they intend to continue in the future, in my opinion, brings them within the scope of the above decision.
 

 The plaintiff’s effort to challenge the school issue by showing that establishments which it chose to call day camps or which indeed call themselves day camps, carry on some of the activities in which defendants are also engaged, falls wide of the mark. This is not just a matter of semantics. If a so-called camp gets to a point where it is engaged exclusively in education, it becomes a school no matter what appellation you choose to append to it.
 

 Before moving on to a consideration of the specific provisions of the zoning ordinance and the building code which are under attack and which are sought to be justified under the “ police power”, it would be well to point out that the residual “police power ” reposes in the State, not in its political subdivision, and that in presuming to exercise it," a municipality first must show a delegation of such power from the State.
 

 The inquiry then becomes twofold: first, does the ordinance or enactment deal with the subject matter which has been delegated, and second, if so, does it have a substantial relation to public health, safety or general welfare? This distinction between the plenary power and the delegated power is especially important in this case where plaintiff has put into the zoning ordinance matters having nothing to do with zoning, and has put in the building code matters having nothing to do with buildings. It must also be kept in mind that since zoning ordinances are in derogation of the common law they must be strictly construed
 
 (440 East 102nd St. Corp.
 
 v.
 
 Murdock,
 
 285 N. Y. 298).
 

 Analogies sought to be drawn by plaintiff from cases which involve an exercise of the police power under a city charter are less than perfect, since the delegation of such power is invariably broader and more complete than the general delegation under the Village Law and the Town Law. This is plainly illustrated in the case of
 
 Matter of Engelsher
 
 v.
 
 Jacobs
 
 (5 N Y 2d 370), where the need for a legislative sanction is made clear by the court at page 374, when it states: “ The New York City Charter authorizes the Board of Hospitals to promulgate the necessary rules and regulations for private proprietary hospitals to promote the public health and welfare (New York City Charter,
 
 *794
 
 § 583-a, subd. 2). Thus, we can see that the Legislature itself, in respect to private proprietary hospitals in New York City, has established them in a separate class and has subjected them to special rules and regulations by the Board of Hospitals.”
 

 The original Zoning Ordinance of the Village of Brookville of 1935 was repealed by a new one enacted in 1952, coincident with the plaintiff’s efforts to prevent Long Island University from locating a college branch in that village. In
 
 Long Is. Univ.
 
 v.
 
 Tappen
 
 (202 Misc. 956, affd. 281 App. Div. 771, affd. 305 N. Y. 893), this ordinance was held to be an unconstitutional encroachment on the rights of an educational institution and that would seem to dispose of this ordinance for the purposes of this ease as well.
 

 I do not subscribe to plaintiff’s contention that there is a distinction to be drawn unfavorable to the defendant because its school is run for profit. This specific point was not involved in the Diocese of Rochester case, but it seems to me the contribution which a private school makes to the public good in educating youngsters, is rendered nonetheless valid because it earns a profit. In America
 
 “
 
 profit ” is not a word of opprobrium as it may be in other areas of the world. Our social and economic systems are based largely upon it.
 

 In considering the 1959 amended zoning ordinance as applied to defendant’s property, the first thing to note is that insofar as it seeks to regulate schools out of existence, the defendant had an established, pre-existing, nonconforming use when it was passed, and defendant’s predecessor in title had been duly issued a certificate of occupancy on September 20, 1956 by the plaintiff village, permitting the use of defendant’s present buildings as a “ school and summer school ” and they have been so used. Therefore, assuming its valid enactment, the amendments could not curtail the defendant’s right to continue its nonconforming use. As was stated in
 
 People
 
 v.
 
 Miller
 
 (304 N. Y. 105, 107):
 
 “
 
 It is the law of this state that nonconforming uses or structures, in existence when a zoning ordinance is enacted, are, as a general rule, constitutionally protected and will be permitted to continue, notwithstanding the contrary provisions of the ordinance.” (See, also,
 
 Town of Sommers
 
 v.
 
 Camarco,
 
 308 N. Y. 537.)
 

 Furthermore, many of the amendments are patently invalid even if applied prospectively. The zoning ordinance, together with the new amendment to the building code, has a series of provisions so onerous that it cannot be seriously expected that anyone could or would comply with them, and yet by definition it excludes a private school
 
 for profit
 
 even from these dubious
 
 *795
 
 benefits. The rule is basic that there must be a rational relationship betwen the evils reasonably apprehended and the provisions of any ordinance enacted under the police power to prevent or cure them.
 

 Section 5a.6 of the zoning ordinance provides that the number of students permitted on a parcel of property at any one time shall not exceed one student for each 30 square feet of classroom area and one student for each 1,000 square feet of outdoor space. The number of square feet of space allotted to a student might properly be mandated as an educational matter or as a health, safety or fire regulation (and in fact it is in many municipalities), but what has that to do with zoning? It is sought to justify this provision on the theory that it regulates the ‘ ‘ concentration or density of population ”, an accepted province of zoning. However, this phrase has traditionally related to the permanent residents of an area. Plaintiff says this phrase should be extended to mean “ concentration of population ” at any given moment as distinguished from a permanent, static status. Under the plaintiff’s meaning it could,
 
 under the guise of zoning,
 
 limit the number of people who may visit a doctor’s office at one time, congregate in a store or the like, a position to which the court cannot subscribe.
 

 The delegation of power to the village to regulate zoning is contained in section 175 of the Village Law and reads as follows: “ For the purpose of promoting the health, safety, morals, or the general welfare of the community, the board of trustees of a village is hereby empowered, by ordinance, to regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes.”
 

 It is clear from a reading of this section how far the plaintiff has strayed outside the field of zoning.
 

 Even considered as a safety or a health matter, the indoor requirements exceed by 100% the minimum standards imposed by typical government agencies which have the right to regulate such matters. (See New York City Health Code, § 49.07, enacted March 23, 1959, which requires 15 square feet per student.) The building code requirements of 26 States were examined by an expert who testified in a related case and I am taking judicial notice of same in this case in accordance with the authority conferred in section 344-a of the Civil Practice Act (subd. 1; subd. 5, par. C.). Eighteen of those States have minimum space requirements for classroom occupancy which range
 
 *796
 
 from 15 to 18 square feet per pupil and as worked out and testified to by said expert, the average requirement is 15.9 square feet per person. The other eight have no such provisions or requirements. The outdoor requirements exceed anything known even to the plaintiff’s expert. Further, on June 8, 1959 just three months prior to the passage of this ordinance, plaintiff entered into an agreement in writing with the Lutheran High School Association permitting one student for every 15 square feet of classroom space, and it is conceded there was no change of conditions in Brookville between June 8,1959, and September 14, 1959 the date of adoption of this ordinance. Incidentally, plaintiff’s building code still provides that one student shall be permitted for every 15 square feet of classroom space. (§ 3A1 [b].) Considered from an educational point of view the State might very well prescribe minimum space standards for students, but it has not seen fit to do so, but neither has it conferred control of the educational function on plaintiff village.
 

 Defendant’s exhibit B S which sets forth certain recommendations made by the Commissioner of Education as applied to nursery schools seeking a registration certificate, suggests 35 square feet of indoor space and 100 to 200 square feet of outdoor space per student, but as Commissioner Knox testified, there is no compulsion for existing schools to conform to these recommendations and there are numerous schools which do not. Even here we note the wide disparity between the outdoor space figures of the State and village.
 

 The off-street parking requirements of section 5A.7 which dictate 200 square feet for each three students without making any provision for the fact that none of the defendant’s students are of driving age is another instance of unreasonableness per se. Since it applies alike to all schools of defendant’s type and there is nothing unique about the hardship which it imposes on the defendant, the suggested remedy of applying for a variance is not available to defendant.
 
 (Otto
 
 v.
 
 Steinhilber,
 
 282 N. Y. 71.)
 

 The 1959 amendments to the building code contain some truly extraordinary provisions. For instance, section 3 provides: “ No building shall be hereafter erected, altered, extended,
 
 used or maintained
 
 as a school unless the building, alteration or extension is of fireproof construction. ’ ’
 

 This simple provision at one stroke would destroy defendant’s investment of over $180,000 without recourse or compensation of .any kind. The law does not tolerate, this.
 
 (People
 
 v.
 
 Miller,
 
 304 N. Y. 105,
 
 supra.)
 
 I regard plaintiff’s counsel’s concession that this provision ‘ ‘ does not apply to existing schools provided they were used as schools prior to the ordinance ” of no impor
 
 *797
 
 tance, since the language is plainly to the contrary and he has no power to repeal the ordinance. Furthermore, section 5 provides that the whole ordinance is retroactive.
 

 The delegation of power to a village to regulate by a building code, the manner of construction of a building is contained in section 90-a of the Village Law, which reads, in part, as follows:
 
 ‘ ‘
 
 The board of trustees of any village * * * may * * * adopt an ordinance to be known as the building code, which shall provide therein rules and regulations for the construction, alteration, removal and inspection of all buildings or structures erected or to be erected within the limits of the village, providing therein and regulating thereby the plans and means of all such construction, alteration or removal of all of such buildings and structures. ’ ’ Nowhere in this section is there the remotest suggestion that a village may exact an initial permit fee of $250 on existing buildings and an annual renewal of $50 such as is contained in section 2c. of plaintiff’s building code. This sounds more like the type of an ordinance which is used to regulate auctioneering, hawking and peddling, under section 91 of the Village Law. An examination of that section and of section 89 (subds. 48, 52) indicates the type of activities from which a village may exact an annual licensing fee. Under the maxim “ enumerato unius est exclusio alterius ” the enumeration of such items as the running of public carriages, cabs and carts, or the operation of circuses, theatres and poolrooms would certainly exclude an activity so dissimilar as that of conducting a school.
 

 The vice of section 4c. which demands central heating and then further provides that it must be steam, hot water or hot air, does not become apparent until we learn that defendant’s school is heated from a central electric system and thus is excluded, although it is common knowledge that this is the cleanest and safest system in existence. Furthermore, this very system was approved on April 11,1955, by the New York Board of Fire Underwriters and nothing was shown to indicate that any change has taken place since then.
 

 Section 4g. (i.e. the second § 4, since there are two of them) requires a school to erect a six-foot stockade-type fence where it adjoins residential property. The roadside, where a fence conceivably might be of some utility to protect the children, is ignored. Furthermore the fact that plaintiff has decreed a stockade fence to the exclusion of a chain link fence, for example, although it is common knowledge that the latter would be more effective as a safety measure, indicates that plaintiff was motivated by considerations of aesthetics. As was pointed out
 
 *798
 
 by Judge Froessel in
 
 Matter of Presnell
 
 v.
 
 Leslie
 
 (3 N Y 2d 384), the courts have never sustained a zoning ordinance for purely aesthetic reasons, and this must be at least equally true with respect to a building code provision. The proof is that such a fence would cost $3 per lineal foot which would result in an expenditure by defendant of some $13,000 to enclose its property in the manner demanded. As against this, there is no corresponding benefit that will inure to the general public which would justify imposing such a burden on an individual property owner.
 

 There is an additional and even more serious defect in the fence provision. No authority has been cited to show that a village may, under a building code, compel construction to be commenced as distinct from regulating the manner of construction when an owner himself desires to build and initiates the procedure, and I know of none.
 

 It is my understanding that the powers of a municipality to regulate construction in future, are very much greater than they are with respect to existing buildings. A rule which would permit the destruction of valuable property rights by simply relating the matter to the general welfare, as plaintiff seeks to do here, would make a shambles of the due process clause of the Constitution.
 

 How far the police power will go in sustaining a governmental agency in interfering with established property rights without paying compensation therefor is not capable of exact statement. Apparently it is a matter of weighing the urgency of the evil to be corrected against the cost to the property owner of complying with the new law, or the diminution in value which results from it, and as was said in
 
 Pennsylvania Coal Co.
 
 v.
 
 Mahon
 
 (260 U. S. 393, 413): “ When it reaches a certain magnitude, in most if not all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts. ’5
 

 Similar sentiments are expressed in the
 
 Health Dept., City of New York
 
 v.
 
 Rector
 
 (145 N. Y. 32) where it is stated at pages 41-42: “ The exaction must not alone be reasonable when compared with the amount of the work or the character of the improvement demanded. The improvement or work must in itself be a reasonable, proper and fair exaction when considered with reference to the object to be attained. If the expense to the individual under such circumstances would amount to a very large and unreasonable sum, that fact would be a most material one in deciding whether the method or means adopted for the attainment of the main object were or were not an unrea
 
 *799
 
 sonable demand upon the individual for the benefit of the public. Of this the courts must, within proper limits, he "the judges.”
 

 Measured against this standard, few of the 1959 amendments to the building code can survive. It is unnecessary to discuss them all in detail, since many are academic so far as this case is concerned.
 

 The 1959 amendments to the zoning ordinance do not, by their terms, purport to apply to existing uses although plaintiff claims that they do, and I hold as a matter of law that they do not.
 

 The complaint is, therefore, dismissed; the temporary injunction heretofore granted is vacated, and judgment on the counterclaim is granted in accordance herewith.
 

 This decision contains the findings which this court deems essential as required by section 441 of the Civil Practice Act. Settle judgment on notice.