Frank A. Gtjlotta, J.
Plaintiffs seek a judgment declaring unconstitutional and void certain amendments of the Building Code and the Building Zone Ordinance of the Town of Hempstead enacted July 14, 1959. [See 10 A D 2d 648.]
For the purposes of this trial it is conceded by the defendants that each of the four plaintiffs has been duly chartered by the State Board of Regents pursuant to sections 216 and 217 of the Education Law to conduct a nursery school, kindergarten, and certain elementary grades, that each of the plaintiffs is a school within the traditional meaning of that term, and that each, for varying periods of time prior to the enactment of the amendments in question, has been so established and carrying on the functions of a private school.
Each of the schools is located within the unincorporated area of the Town of Hempstead over which defendants have legislative jurisdiction.
Plaintiff Betty-June School was established in May, 1955, and is located in Elmont on a plot 60 feet by 108 feet, almost entirely enclosed by a 4-foot “ cyclone fence ” (except for a few feet of wooden fence). It has a total area of some 6,500 square feet, 1,000 of which is taken up by a building which houses 2 classrooms. The outdoor area, consisting of some 5,500 square feet, is occupied in part by a permanent, immovable cement swimming pool, and some play-yard equipment such as swings, climbing bars and the like all of which are at least partially located within the new 25-foot front yard and the 5-foot rear and side yard setback amendments which are made applicable to existing buildings. It has a total investment of $35,000 in this enterprise.
Plaintiff Creative Country Day School is located in North Valley Stream on a 3%-acre plot having a perimeter of 1,800 lineal feet. The buildings on said premises comprise an area of 8,187 square feet which are divided into 15 classrooms, 8 of which are heated by a permanent heating system, the remaining 7 having no heat because they are used only in the Summertime. Most classrooms have 2 exits; some have 3. Here again portions of the swimming pool and some of the equipment is located within the setback areas established by the new ordinance. This school has been functioning for some 2 years and represents an investment in excess of $400,000.
Plaintiff Maplewood School occupies an area which is slightly loss than 3 acres, having a perimeter of about 1,300 feet, *911 enclosed on 2 sides and the front by a 3%-foot chain link fence, and in the rear by a fence made up of chain link, wood stockade and hedges. The buildings have a floor area of 4,300 square feet and are divided into 8 classrooms each having at least 2 exits, one of which leads into the outdoors and the other into a corridor or another classroom. Within the proposed new setback area there was erected, prior to the present enactment, a basketball' court, children’s climbing equipment and other devices. The investment in this project is in excess of $100,000.
Factually, this plaintiff is confronted with a problem peculiar to its own operation. One of its classrooms is conducted in a basement of a brick and cement block building. The room has 2 exits, one leading to the outdoors, the other to the upper level which in turn has exits. All the walls and ceilings are of non-combustible material and on May 27, 1957, a certificate of occupancy was issued therefor by the town as an addition to the nursery school. It now demands the removal of the wooden beams and %-inch sheet rock tile on the ceiling and directs that it be replaced by steel beams in conformity with section 303 of the Building Code.
The plaintiff Merrick Woods School has been operating for the last 4 years on a plot a little larger than 3 acres with a perimeter of some 2,600 feet almost entirely enclosed with a fence, part of it chain link and the remainder a wooden picket fence. It has a total investment of $200,000 in its project and expends some $125,000 per year in salaries for teachers. It estimates the construction of a stockade fence in place of its present one would involve an expenditure of $10,000.
Before entering into a detailed discussion of the specific provisions of both the zoning ordinance and the building code which are attacked here by one or more of the plaintiff schools, some general observations which apply to all the amendments would appear to be in order.
First, schools are defined in both to mean “ all schools other than public (schools) devoted to academic instruction”. This of course includes all parochial schools and as will become evident when the terms of these amendments are discussed, would have the effect of making the continued operation of scores of these schools throughout the Town of Hempstead unlawful. Appalled by such a prospect, and with the unimaginable chaos which would result if all the children who attend these schools were suddenly thrust upon the public school system, not to mention the expense, apparently the town has *912 reconsidered the matter and it is admitted in the pleadings that the amendments are in fact not being enforced against parochial schools and that there is no intention to so enforce them. Thus with commendable candor, we have an official admission that discrimination is being practiced against the plaintiffs and that they are being denied the equal protection of the laws. This is as objectionable when it results from discriminatory enforcement of the laws as it is- when the enactment sets up its own method for discrimination. (12 Am. Jur., Constitutional Law, § 566.)
The second point involves, not a constitutional question, but a question of the town’s right to legislate at all in purely educational matters.
In a related ease (Inc. Vil. of Brookville v. Paulgene Corp., 24 Misc 2d 790, 793) I sought to highlight this limitation on the “police power” of any State subdivision which is acting-under a delegation of power, by contrasting it with the residual police power which originates in and rests with the State Legislature. The Court of Appeals very recently (Dec. 30, 1959) had occasion to discuss this very question in the Matter of Bologno v. O’Connell (7 N Y 2d 155) where, in commenting on the refusal of the Commissioner of Licenses of the City of New York to license a junk yard on considerations of public health, safety and welfare and in overruling him the court said, “ We believe this attempt to exercise a general power is in excess of the authority intended to be conferred ”, It pointed out that the zoning function had been vested in the Planning-Commission and thus the License Commissioner was without authority to adopt a contrary view in this area. The court noted further at page 160 that ‘ ‘ although the Legislature clearly intended, under its police power, to regulate the junk business in each of its distinct aspects of public concern (i.e., zoning- and prevention of crime) there should be no doubt that the power to do so was divided and separately conferred.” This principle applies with greater force where the State retains the regulatory power as it has done in the field of education vis-a-vis the town.
Many of the enactments which we have to consider use a very confusing sentence structure in which they are made to apply to existing schools by such expressions as “no building shall hereafter be utilized as a school ” or “no building shall hereafter be maintained as a school ” and then exempt existing schools before the end of the same sentence. In other words there are two possible types of schools, those already established and those hereafter to be established. Expressions such as those outlined above include both classes. If the intention *913 is to exempt existing schools, why include them in the first place ?
Considering the zoning amendment first, the grant of power is contained in section 261 of the Town Law, and reads as follows: “ For the purpose of promoting the health, safety, morals, or the general welfare of the community, the town board is hereby empowered by ordinance to regulate and restrict the height, number of stories, and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes ” and new article 16 purports to have been passed pursuant to it. Section SP-1.2 (b) requires that all classroom area be serviced by a permanent heating plant in order to be considered in computing the student load. Aside from the manifest unreasonableness of this as applied to schools operated exclusively in the Summer, it has nothing to do with “ zoning ”.
Section SP-1.5 attempts to proscribe existing permanent structures such as a swimming pool in a new setback area and this is merely a confiscation of private property without due process of law. It further attempts to control the placing of movable equipment such as a swing in the same setback area, a radical extension of the zoning concept. Following this idea to its logical conclusion, inhabitants of the town could be told where to put their lawn chairs.
Section SP-1.6 attempts to relate the number of students permitted in a school at any one time to the classroom area and to the outdoor area — 1 student for each 30 square feet of classroom and 1 student for each 200 square feet of outdoor area (probably one student for both of these areas was intended, since the way it is written makes little sense).
The only possible theory on which this provision can be deemed a zoning provision is on the supposition that the power to regulate “ density of population ” includes a power to control the temporary presence of persons in a particular location. That this is not the meaning of the phrase is made clear in Matter of Stevens v. Clarke (216 App. Div. 351, 360), where the court indicates its meaning to cover “ restricting the number of families that might lawfully be housed on an acre of ground, or' a fractional part thereof”. (Italics added.)
Considered as an educational regulation, I have already indicated why this is outside the scope of the town’s jurisdiction.
The last category into which it might fit is that of a safety or health measure. Overlooking the fact that if it was so *914 intended it is mislabeled, as having been passed pursuant to article 16, the zoning article, instead of article 9, the general ordinance article, subdivision 5 of section 130, where authority is found to regulate attendance in public buildings, and considering same on the merits, the proof before me shows that it exceeds by far the standards fixed by other competent authorities in the field, indicating that this is a mere subterfuge to harass the plaintiffs.
The building exits code adopted by the National Fire Protection Association, an organization which includes 200 national and regional societies and associations, including many departments of the United States Government and the State of New York, sheds a good deal of light on this subject. Section 22 thereof entitled ‘‘ Educational Occupancies ’ ’, paragraph 2202, indicates that a maximum capacity of 1 person per 40 square feet of gross floor area which equates to 1 person per 20 square feet of net area is an acceptable standard. It is stated that this accords with general counts of typical schools throughout the country and is in substantial agreement with State laws on school construction.
Location and number of exits are treated with under paragraph 2211. These are controlled by the student load as determined under section 22 and not the other way around as was suggested at the trial. We find this to be 100 students per ‘1 unit of exit width ’ ’ which under paragraphs 3212 and 3214 is defined as a door of at least 30 inches. All plaintiffs’ establishments more than meet these specifications.
Municipalities are not to be allowed to abuse the police power and hide behind a presumption of legality by vague references to alleged safety hazards.
The outside minimum area obviously has nothing to do with fire safety and nothing has been called to my attention to justify the sudden doubling of the 15 square feet of indoor space required by the defendant’s own building code. (See art. VI, § 601 [b] 2.)
It may be noted in passing that in the City of New York where we may assume the requirements were adopted without any ulterior motive of harassment, but solely in the interest of health and safety in the light of modern thinking on the subject, in both the Administrative Code (§ C26-273.0, subd. c, par. 1, cl. [c]) and in the very recent revision of the Health Code dated March 23, 1959 (§ 49.07) the standard set is likewise 15 square feet per student, in classrooms in schools and colleges.
Turning now to the town’s building code, section 3 [a] requires all private schools to secure a permit from the manager of the *915 building department which is renewable annually. Except for the amount of the fees, it does not differ materially from similar requirements in the Village of Brookville case (supra) which I have held to be invalid. Although this is called a permit, it is in fact a license and there is no authority for it to be found in section 136 of the Town Law, from which section the town derives its authority to license. The enumeration of such occupations as auctioneers, pawnbrokers, junk dealers, etc., indicates clearly that there was no intention by the Legislature to include anything so incongruous as a school in this licensing classification.
Section 5 [4] has particular application to plaintiff Maple-wood School, in that it prohibits the use of a basement for a classroom unless it is of fire-safe construction. A basement by definition is a room with the ceiling not less than 4 feet 3 inches above the street grade. Plaintiff’s Exhibit 7 shows these rooms to be clean, bright and spacious and as recently as March 22, 1957 were certified by the defendant town to have been properly constructed. Yet under this section it would now be necessary to practically demolish this new building in order to substitute steel beams for the present wooden ones. The police power of the town does not extend so far. The early case of Health Dept. v. Rector Trinity Church (145 N. Y. 32, decided Feb., 1895) indicates the limitations on such power as applied to existing buildings. There the challenged requirement was to install one spigot for Croton water on each floor of a multiple dwelling in New York City for use by all families on that floor, and the court held that the expense was so minor compared to the benefits to be derived from the standpoint of health and safety that the order was valid, but expressed doubt as to a similar requirement for water closets. We have come a long way since this decision, but not so far, I think as to require the ripping down of a building, only to incorporate a mere preferential mode of construction. After all, there are literally millions of buildings in this country, both public and private, with wooden beams, which have been giving satisfactory service for a long time, some of them for over a century.
The last section we have to consider is section 5 [13] with its ukase for a 6-foot stockade fence where a school adjoins residential property and there only. What I said in the Brookville case (supra, pp. 797-798) applies here also: “ The roadside, where a fence conceivably might be of some utility to protect the children, is ignored. Furthermore the fact that plaintiff has decreed a stockade fence to the exclusion of a chain link fence, *916 for example, although it is common knowledge that the latter would be more effective as a safety measure, indicates that plaintiff was motivated by considerations of aesthetics. As was pointed out by Judge Froessel in Matter of Presnell v. Leslie (3 N Y 2d 384), the courts have never sustained a zoning ordinance for purely aesthetic reasons, and this must be at least equally true with respect to a building code provision.”
The cost at $3 per lineal foot would vary with each of these plaintiffs, but here too there is no public benefit being served, as distinct from some private assuaging of neighbors’ feelings or sensibilities, which would justify imposing such a burden on an individual property owner.
Additionally a town has no more authority than a village to use its building code to compel an owner to commence construction rather than prescribe the manner performing construction which he desires to undertake.
Judgment is granted for the plaintiffs in accordance with this decision, without costs.
This decision contains the findings which this court deems essential as required by section 440 of the Civil Practice Act. Settle judgment on notice.