[No. 64926-0.   En Banc.]
Argued March 11, 1998.     Decided July 23, 1998.

RHOD-A-ZALEA & 35TH, INC., *Respondent*, v. SNOHOMISH
County, *Petitioner.*

2

SANDERS and DOLLIVER, JJ., dissent by separate opinion.

*James H. Krider, Prosecuting Attorney*, and *Carol Weibel, Deputy*, for petitioner.

*Anderson, Hunter, Dewell, Baker & Collins*, by *Bradford N. Cattle*, for respondent.

*Norm Maleng, Prosecuting Attorney*, and *Cassandra Newell, Deputy*, on behalf of King County, amicus curiae.

*Brent D. Boger, John M. Groen*, and *Robin L. Rivett* on behalf of Pacific Legal Foundation, amicus curiae.

MADSEN, J. — Snohomish County seeks to reinstate a decision of the Snohomish County Hearing Examiner (Examiner) in which he decided that, although Rhod-A-Zalea and 35th, Inc. (Rhod-A-Zalea) established a nonconforming use under the county's zoning code to peat mine on the subject property, it was separately subject to provisions of the county's building code requiring it to obtain a grading permit for its ongoing excavation and fill activities. The trial court reversed the Examiner, finding that because Rhod-A-Zalea established a nonconforming use it was not required to obtain the grading permit. The Court of Appeals agreed. We reverse and reinstate the decision of the Snohomish County Hearing Examiner.

## STATEMENT OF THE CASE

Rhod-A-Zalea owns property in Snohomish County on which it has conducted peat mining activities since at least 1961. In response to a complaint regarding excessive ponding on a neighboring property, the Snohomish County Department of Community Development (County) initiated an investigation resulting in issuance of a Notice and Order to Rhod-A-Zalea. The notice charged two code violations: (a) the excavation and processing of minerals without first obtaining a conditional use permit required under SNOHOMISH COUNTY CODE (SCC) 18.32.040 (the zoning code use matrix), and (b) grading without necessary permits and

approvals required under SCC 17.04.280 of the county building code. The Notice and Order imposed a 30-day compliance period, after which civil penalties would be assessed. Rhod-A-Zalea timely filed an appeal and the compliance schedule was stayed. No penalties were imposed.

A business attempting to establish a use prohibited by the zoning ordinance must obtain a conditional use permit unless it is a valid nonconforming use. A conditional use permit allows otherwise prohibited activities based on certain restrictions. At the hearing before the Examiner, Rhod-A-Zalea presented evidence that the peat mining operation had been conducted on the subject property since a date prior to the enactment of a zoning ordinance which prohibited the use in that area. The Examiner found Rhod-A-Zalea had established that it was a valid nonconforming use and that a conditional use permit was not required. This ruling was not challenged on appeal.

The Examiner further ruled that Rhod-A-Zalea was subject to police power regulations including the building code provisions regulating grading contained in Title 17 SCC. Under SCC 17.04.280, no one may conduct any grading (excavating and filling) without first obtaining a grading permit, with certain exceptions. Among other things, a grading permit application must include grading plans, grading quantities, erosion and sedimentation controls, and a drainage plan. SCC 17.04.295. The code sets forth operating standards for grading activities, including slope, erosion control, ground preparation, fill material, drainage, benches and terraces, and access roads. SCC 17.04.310. Also, the code specifies steps which must be taken upon completion of activities. SCC 17.04.320. Finally, fill placed on land adjacent to or under any stream or water body must be contained so as to prevent damage to other lands. SCC 17.04.330. When determining that Rhod-A-Zalea was subject to the grading permit requirement the Examiner explained:

> Such prohibition of any requirement of a general use permit does not lift the requirement of specific operational activity

permits, such as the grading permit in question. Similarly, building construction in the continued operation of a nonconforming use requires a building permit; a change in the use of an existing building (without changing the overall nonconforming use, such as by relocating individual operational aspects within the nonconforming use to different structures, for example changing the location of explosives storage) would require a Certificate of Occupancy under the building code; and business license requirements are not lifted by virtue of the establishment of a nonconforming use under the zoning code.

Appellant's Br. at 190; Snohomish County's Return to Writ of Cert. at 190.

Rhod-A-Zalea appealed the Examiner's decision by writ of certiorari and the superior court ruled in favor of Rhod-A-Zalea. The court determined that Rhod-A-Zalea had a vested right to continue the peat mining operation, and since the operation by its nature involved grading, excavating, and filling, it was not subject to the County's grading regulations, which were enacted after the mining operation began. Snohomish County appealed the superior court's decision.

The Court of Appeals agreed with the superior court stating that requiring Rhod-A-Zalea to obtain a grading permit would allow the county to regulate "virtually every aspect of the peat mining operation . . . ." *Rhod-A-Zalea & 35th, Inc. v. Snohomish County*, No. 36658-1-I, slip op. at 4 (Wash. Ct. App. July 22, 1996). The court found that a nonconforming use "carries with it the right to the exercise of those accessory uses which are considered customary and incidental to the principal use." *Id.* at 5. The court dismissed other authority, including a Supreme Court decision which held that nonconforming uses are subject to later-enacted police power regulation. The Court of Appeals stated that

[t]hese cases come from states which have adopted a majority position approving retroactive application of new zoning or development legislation. Washington State adopted and maintains a strong minority position in recognizing vested

property rights and the protection of those rights against subsequently adopted development regulations. *See Mercer Enterprises, Inc. v. [City of] Bremerton*, 93 Wn.2d 624, 627, 611 P.2d 1237 (1980) (retroactive effect of later zoning regulations not recognized in Washington). Here, the building code that the County seeks to apply was adopted in 1985 long after this mining operation.

*Id.*

Snohomish County's motion for reconsideration was denied and it then petitioned this court for review.

## DISCUSSION

It is undisputed that Rhod-A-Zalea operates a valid nonconforming use. The issue before this court is whether Rhod-A-Zalea's nonconforming peat mining operation is subject to police power regulations subsequently enacted for the health, safety and welfare of the community. Specifically, we are asked to determine whether Rhod-A-Zalea must obtain a grading permit as required by SCC 17.04.280.

■ A nonconforming use is a use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance, although it does not comply with the zoning restrictions applicable to the district in which it is situated. *See* 1 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING § 6.01 (Kenneth H. Young ed., 4th ed. 1996). The right to continue a nonconforming use despite a zoning ordinance which prohibits such a use in the area is sometimes referred to as a "protected" or "vested" right. *See Van Sant v. City of Everett*, 69 Wn. App. 641, 649, 849 P.2d 1276 (1993); *Martin v. Beehan*, 689 S.W.2d 29, 31 (Ky. Ct. App. 1985); 4 ARDEN H. RATHKOPF, THE LAW OF ZONING AND PLANNING § 51A.01 (Edward H. Ziegler ed., 1991). This right, however, refers *only* to the right not to have the use *immediately terminated* in the face of a zoning ordinance which prohibits the use. *See* 1 ANDERSON, AMERICAN LAW OF ZONING § 6.01; RICHARD L. SETTLE, WASHINGTON LAND USE AND ENVIRONMENTAL LAW AND PRACTICE § 2.7(d) (1983).

"The ultimate purpose of zoning ordinances is to confine certain classes of buildings and uses to certain localities. The continued existence of those which are nonconforming is inconsistent with that object, and it is contemplated that conditions should be reduced to conformity as completely and as speedily as possible with due regard to the special interests of those concerned, and where suppression is not feasible without working substantial injustice, that there shall be accomplished 'the greatest possible amelioration of the offending use which justice to that use permits.' "

*State ex rel. Miller v. Cain,* 40 Wn.2d 216, 221, 242 P.2d 505 (1952).

The theory of the zoning ordinance is that the nonconforming use is detrimental to some of those public interests (health, safety, morals or welfare) which justify the invoking of the police power. *Id.* at 220. Although found to be detrimental to important public interests, nonconforming uses are allowed to continue based on the belief that it would be unfair and perhaps unconstitutional to require an immediate cessation of a nonconforming use. *Id.* at 218. A protected nonconforming status generally grants the right to continue the existing use but will not grant the right to significantly change, alter, extend, or enlarge the existing use. *Id.* Moreover, zoning ordinances may provide for termination of nonconforming uses by abandonment or reasonable amortization provisions. *See* SETTLE, WASHINGTON LAND USE § 2.7(d).

██ ██ While some states' authority to terminate, alter, or extend nonconforming uses is expressly granted or withheld in zoning enabling acts, Washington's enabling acts are silent regarding the regulation of nonconforming uses. *See id.* Instead, the state Legislature has deferred to local governments to seek solutions to the nonconforming use problem according to local circumstances. In Washington, local governments are free to preserve, limit or terminate nonconforming uses subject only to the broad limits of applicable enabling acts and the constitution. *See id.*

Commentators agree that nonconforming uses limit the effectiveness of land-use-controls, imperil the success of community plans and injure property values. *See* 1 ANDERSON, AMERICAN LAW OF ZONING § 6.02; SETTLE, WASHINGTON LAND USE § 2.7(d); Daniel R. Mandelker, *Prolonging the Nonconforming Use: Judicial Restriction of the Power to Zone in Iowa*, 8 DRAKE L. REV. 23 (1958); C. McKim Norton, *Elimination of Incompatible Uses and Structures*, 20 LAW & CONTEMP. PROBS. 305 (1955); James A. Young, *The Regulation and Removal of Nonconforming Uses*, 12 W. RESERVE L. REV. 681 (1961). For these reasons, nonconforming uses are uniformly disfavored and this court has repeatedly acknowledged the desirability of eliminating such uses. *See Ackerley Communications, Inc. v. City of Seattle*, 92 Wn.2d 905, 920, 602 P.2d 1177 (1979) ("It is a valid exercise of the City's police power to terminate certain land uses which it deems adverse to the public health and welfare within a reasonable amortization period."); *Keller v. City of Bellingham*, 92 Wn.2d 726, 730-31, 600 P.2d 1276 (1979) ("the severity of limitations in phasing out [nonconforming uses] is within the discretion of the legislative body of the city"); *Bartz v. Board of Adjustment*, 80 Wn.2d 209, 217, 492 P.2d 1374 (1972) ("phasing out a nonconforming use . . . is the desirable policy of zoning legislation" and is "within the discretion of the legislative body of the city or county."); *State v. Thomasson*, 61 Wn.2d 425, 427, 378 P.2d 441 (1963) ("there are conditions under which a nonconforming use may be constitutionally terminated"); *Cain*, 40 Wn.2d at 220 ("It was not and is not contemplated that preexisting nonconforming uses are to be perpetual.").

Thus, it is clear that local governments have the authority to preserve, regulate and even, within constitutional limitations, terminate nonconforming uses. Rhod-A-Zalea, however, argues that it is not subject to any police power regulations, including health and safety regulations, enacted after the existence of their facility. In particular, Rhod-A-Zalea argues that it is not subject to the grading

permit requirement because their peat mining facility has been in operation since 1961 and the grading permit regulation was enacted in 1985.

Rhod-A-Zalea's argument is not supported by established land use jurisprudence and is contrary to Washington's desired policy of phasing out nonconforming uses. Moreover, it is counterintuitive to conclude that nonconforming uses which are contrary to public interests, such as health, safety and welfare, would then be exempt from subsequently enacted public health and safety regulations.

As one commentator has explained:

> [a] lawful existing nonconforming use or structure may continue to be operated by virtue of the protection afforded by statutory or ordinance provisions or by constitutional vested rights doctrines. However, this protection is limited. Nonconforming uses generally are held to be subject to later police power regulations imposed by statute or local ordinances regulating the manner or operation of use. These regulatory restrictions often take the form of licensing or special permit requirements.

ARDEN H. RATHKOPF, THE LAW OF ZONING AND PLANNING § 51A.02 (citations omitted); *see also* 1 ANDERSON, AMERICAN LAW OF ZONING § 6.78 ("[a] nonconforming use is amenable to municipal ordinances which regulate similar uses, conforming or nonconforming.").

Courts have consistently recognized that nonconforming uses are subject to subsequently enacted reasonable police power regulations. *See Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S. Ct. 987, 8 L. Ed. 2d 130 (1962); *Miller & Son Paving, Inc. v. Wrightstown Township*, 42 Pa. Commw. 458, 401 A.2d 392 (1979); *Watanabe v. City of Phoenix*, 140 Ariz. 575, 683 P.2d 1177 (Ct. App. 1984), *Dock Watch Hollow Quarry Pit, Inc. v. Township of Warren*, 142 N.J. Super. 103, 361 A.2d 12 (1976). Only where the regulation would immediately terminate the nonconforming use have courts found the regulation to be invalid as applied to the nonconforming use. *See Township of Orion v. Weber*, 83 Mich. App. 712, 269 N.W.2d 275 (1978); *Incorporated Vil-*

*lage of Brookville v. Paulgene Realty Corp.*, 24 Misc. 2d 790, 200 N.Y.S.2d 126 (1960). These rulings are consistent with the principle that a nonconforming use has a "vested" or "protected" right to continue without being subject to immediate termination. Local governments, of course, can terminate nonconforming uses but they are constitutionally required to provide a reasonable amortization period. *See* SETTLE, WASHINGTON LAND USE § 2.7(d).

The leading case from the Supreme Court recognizing that a nonconforming use is subject to later enacted regulations is *Goldblatt. Goldblatt*, 369 U.S. 590. In *Goldblatt*, a local jurisdiction adopted an ordinance regulating dredging and pit excavations. *Id.* at 592. The owners of a nonconforming sand and gravel mining operation challenged the ordinance which allegedly would have involved an outlay of one million dollars. *Town of Hempstead v. Goldblatt*, 9 N.Y.2d 101, 172 N.E.2d 562, 565, 211 N.Y.S.2d 185 (1961). The owners argued that the regulation was not a bona fide safety measure and was instead designed to force the discontinuation of the use. *Id.* In a unanimous opinion, the Supreme Court found the regulation was reasonably related to the health, safety and welfare of the community and upheld the application of the ordinance to the nonconforming use even though it conceded the "ordinance completely prohibits a beneficial use to which the property has previously been devoted." *Goldblatt*, 369 U.S. at 592. The Court explained that "every regulation necessarily speaks as a prohibition. If this ordinance is otherwise a valid exercise of the town's police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional." *Id.*

Other courts have also recognized the authority of local government to regulate the operations of a valid nonconforming use. In *Watanabe v. City of Phoenix*, landowners challenged an ordinance requiring that any lot used for parking of three or more motor vehicles be paved for dust control. *Watanabe*, 683 P.2d 1177. The landowners, who had graveled the lots for dust control, argued that the city

could not enforce the ordinance because it affected their existing nonconforming use. *Id.* at 1179. The Arizona Court of Appeals found the ordinance was applicable to the nonconforming use and required the landowners to pave their lots. *Id.* at 1180.

The court reasoned that the principle underlying the protection of nonconforming uses was merely to avoid the injustice of requiring their immediate termination, and, thus, while nonconforming uses could not be prohibited under new zoning ordinances, they were still subject to reasonable regulations under the city's police power to protect the public health, safety and welfare. *Id.* The court also emphasized that the regulation would not affect their ability to continue the nonconforming use and that the appellants did not argue that the regulation would make their business economically unfeasible. *Id.*; *see also Miller & Son Paving, Inc.*, 401 A.2d 392 (the court found that a nonconforming quarry was subject to an ordinance requiring the construction of a fence around the property, noting that the ordinance was passed to safeguard the public and that it would not interfere with the owner's right to quarry the land).

Another similar case is *Dock Watch Hollow Quarry Pit, Inc. v. Township of Warren*, where the issue as framed by the court was "the extent to which a municipality may regulate by ordinance adopted pursuant to the police power a previously declared nonconforming use of land." *Dock Watch*, 361 A.2d at 15. The court found that although the quarry's status as a nonconforming use "may protect it from later zoning restrictions, its status as such does not render it immune from reasonable regulations pursuant to the police power in the interest of the public health, welfare and safety," including "those designed for the preservation of the environment and the protection of ecological values." *Id.* at 20 (citations omitted).

In particular, two regulations were upheld even though evidence was presented that the restrictions would reduce the quarry's potential excavating material by half, costing

the quarry approximately $26 million. *Id.* at 17. While the court recognized the impact to the quarry, it emphasized that "the welfare of the community should not be sacrificed for the purpose of permitting Dock Watch the most profitable use of that land." *Id.* at 25.

Thus, courts agree that nonconforming uses, although protected from zoning ordinances which immediately terminate their use, are subject to later-enacted regulations enacted for the health, safety and welfare of the community. *See, e.g., Mt. Bethel Humus Co. v. Department of Envtl. Protection & Energy*, 273 N.J. Super. 421, 642 A.2d 415 (1994) (nonconforming use subject to reasonable zoning restrictions which do not require the immediate cessation of such use); *Renne v. Township of Waterford*, 73 Mich. App. 685, 252 N.W.2d 842 (1977) (nonconforming use required to abandon septic tanks in favor of a public sewer system); *State ex rel. Keener v. Serr*, 53 Ohio App. 2d 143, 372 N.E.2d 360 (1976) (nonconforming junkyard must comply with ordinance requiring list of material held in the yard); *Zoning Comm'n of Town of Groton v. Tarasevich*, 165 Conn. 86, 328 A.2d 682 (1973) (nonconforming use required to obtain a license); *Clouatre v. Town of St. Johnsbury Bd. of Zoning Adjustment*, 130 Vt. 189, 289 A.2d 673 (1972) (nonconforming use subject to later-enacted regulation to protect the public welfare); *City of Rutland v. Keiffer*, 124 Vt. 357, 205 A.2d 400 (1964) (nonconforming use subject to licensing requirements); *City of Chicago v. Miller*, 27 Ill. 2d 211, 188 N.E.2d 694 (1963) (nonconforming use subject to later-enacted ordinance requiring improvements to the defendant's property); *City of Akron v. Klein*, 171 Ohio St. 207, 168 N.E.2d 564 (1960) (nonconforming use subject to time restrictions); *Hantman v. Township of Randolph*, 58 N.J. Super. 127, 155 A.2d 554 (1959) (nonconforming use subject to regulations restricting the number of months during which a business can operate); *Lyman G. Realty Corp. v. Gillroy*, 5 A.D.2d 520, 172 N.Y.S.2d 907 (1958) (nonconforming use subject to ordinance requiring a permit for roof sign).

Courts, however, have been alert to the possibility that a

municipal corporation may seek to terminate a nonconforming use by the imposition of regulations so onerous as to render further use impractical. A village, for example, amended its zoning ordinance in order to require a nonconforming private school to meet parking, heating, and construction standards which would have rendered continuance of the school economically impossible. *Paulgene Realty*, 200 N.Y.S.2d at 133. Because the imposition of the ordinance would have the effect of terminating the use, the court held the ordinance invalid. *Id.* at 133-35; *see also Weber*, 269 N.W.2d 275 (court declined to apply portion of zoning permit requirement to nonconforming use because it was found to be confiscatory in nature).

Rhod-A-Zalea does not argue, nor does the record indicate, that obtaining a grading permit would terminate Rhod-A- Zalea's nonconforming right to peat extraction. Although Rhod-A-Zalea and amicus Pacific Legal Foundation offer arguments regarding potential economic impacts, these concern only the cost of applying for a permit. They note that the ordinance imposes a plan review and inspection fee of $0.33 per cubic yard of earth movement and limits the overall fee to no more than $23,000. SCC 17.02.110(1)(d),(f),(2),(3). Also, they state that these costs do not include the expense of conducting soil engineering and geology reports required by chapter 70 in the appendix of the UNIFORM BUILDING CODE.

Rhod-A-Zalea, however, makes no particularized argument concerning economic impact. For instance, Rhod-A-Zalea does not indicate how much earth on average it moves and, therefore, how much the fee would be, nor does it provide any estimates concerning how much the additional studies would cost. Moreover, there is no evidence concerning the relative value of the business and, therefore, no way to know how, for example, a maximum fee of $23,000 would impact its ability to continue the peat mining operation. Although Rhod-A-Zalea indicates the permitting requirements would be costly, it never argues that the regulation would have the effect of terminating the exist-

ing peat mining operation. While the grading permit requirements may result in some economic impact to Rhod-A-Zalea's mining operations, this is true for all mining operations, conforming or nonconforming.

It is also clear that Snohomish County's grading permit is a reasonable exercise of its police powers. In 1985, Snohomish County amended its building code and required mining operations to obtain a grading permit. SCC 17.04.280. There is no dispute that Rhod-A-Zalea's excavation and fill activity constitutes "grading" as defined in SCC 17.04.290. The stated purpose of the grading and excavating regulations is "to safeguard life, limb, property and the public welfare by regulating grading on private property." UNIFORM BUILDING CODE, ch. 70, § 7001 (1976). Title 24 SCC, the county drainage code, which is made applicable to grading permits by operation of SCC 24.16.120(1)(e) also indicates its intent to:

> promote sound practical and economical development policies and construction procedures which respect and preserve the county's watercourses; to minimize water quality degradation and control the sedimentation of creeks, streams, rivers, ponds, lakes and other water bodies; to protect the public from stormwater runoff originating on developing land; . . . to maintain and protect valuable groundwater resources; to minimize adverse effects of alterations in groundwater quantities, locations and flow patterns; . . . and to decrease drainage-related damage to public and private property.

SCC 24.04.080.

With regard to Rhod-A-Zalea's property, the County's enforcement officer testified that the County's main concern was that Rhod-A-Zalea was not using acceptable fill material. The County's investigation of the site indicated that Rhod-A-Zalea was using a mixture of rock, wood, plastic, and other miscellaneous unidentifiable materials. The enforcement officer noted that the area is quite large, perhaps half the size of a football field. Another neighboring property owner testified that water is running onto his property because the backfill used by Rhod-A-Zalea does not absorb as much water as the peat does.

Although a particularized finding of harm is not required for the grading permit to be applicable, it does appear that there are problems concerning current operations on Rhod-A-Zalea's property which would be cured through the application of the grading permit requirements. The County's grading code controls what kinds of materials may be used as fill and excludes plastic, rock and "similar irreducible material." SCC 17.04.310(D). The ordinance also regulates drainage. SCC 24.16.120(1).

Thus, it is clear the ordinance is reasonable and serves to safeguard the health, safety and welfare of the community. Furthermore, it appears that Rhod-A-Zalea's property is being operated in derogation to these interests and that requiring a grading permit would solve these problems.

To accept Rhod-A-Zalea's arguments and find that this later enacted regulation does not apply to their peat operation because it is a nonconforming use would have serious repercussions for all local governments attempting to regulate property. Rhod-A-Zalea does not adequately speak to this concern. From their position it follows that a nonconforming restaurant would not be subject to later-enacted health codes or business license provisions; a nonconforming factory would be exempt from later-enacted noise or pollution regulations; a nonconforming animal kennel would be exempt from later-enacted licensing or health requirements; and a nonconforming adult entertainment facility would be exempt from later-enacted licensing or public health regulations. Such a result would not be in the public interest and is contrary to law. Also, to allow nonconforming uses to continue exempt from all subsequently enacted health and safety regulations would be devastating to the community's land use planning. Finally, such an exemption would give those nonconforming uses an undeserved and substantial competitive advantage against their "conforming" competitors who are required to comply.

We find that the Court of Appeals and the superior court erred in their decisions that Rhod-A-Zalea is not subject to

the later-enacted grading permit requirement. In reaching its decision, the Court of Appeals dismissed authority to the contrary, including the Supreme Court's decision in *Goldblatt*, stating that those cases involved jurisdictions that have not recognized "vested property rights." *Rhod-A-Zalea*, No. 36658-1-I, slip op. at 5. It is true that Washington is one of only a few states that has adopted the "vested rights doctrine." However, this doctrine has no bearing on the issue of whether a nonconforming use is subject to later-enacted health and safety regulations, as the doctrine applies only to permit applications.

Under Washington's "vested rights doctrine" developers who file a timely and complete building permit application obtain a vested right to have their application processed according to the zoning and building ordinances in effect at the time of the application. *See West Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 51, 720 P.2d 782 (1986). The purpose of the "vested rights doctrine" is to determine or "fix" the rules that will govern land development with reasonable certainty. *Id.* This immunity from regulations adopted subsequent to the time of vesting pertains *only* to the right to establish the development. *See* SETTLE, WASHINGTON LAND USE § 2.7.

Thus, pursuant to the "vested rights doctrine" a permit is considered under the rules in effect at the time of the permit application. This situation is not before the court. Here, the court is concerned with whether a nonconforming use is exempt from later-enacted police power regulations.[1]

The Court of Appeals and the superior court also indicate that because grading is intrinsic to the nonconforming use

---

[1]Even if the "vested rights doctrine" were at issue in this case, it would not allow a business to operate exempt from later-enacted police power regulations. The "vested rights doctrine" protects *only* a permit applicant from regulations enacted after a permit application has been completed and filed and serves only to fix the rules that will govern a particular land use permit application. *See West Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 51, 720 P.2d 782 (1986). Once the development is established, it must then comply with later-enacted police power regulations which are limited only by constitutional safeguards. *See* RICHARD L. SETTLE, WASHINGTON LAND USE AND ENVIRONMENTAL LAW AND PRACTICE § 2.7(c)(vi) (1983).

it is not subject to the permitting requirements. *Rhod-A-Zalea*, No. 36658-1-I, slip op. at 2. This reasoning, however, leads to illogical results. For example, a nonconforming restaurant would not be subject to subsequently-enacted regulations governing the handling and cooking of meat to prevent E. coli contamination because handling and cooking food is "intrinsic" to the restaurant business.

Additionally, case law does not support such a distinction. In *Goldblatt*, the Court required a nonconforming sand and gravel operation to obtain a later enacted permit which regulated dredging and pit excavation. *Goldblatt*, 369 U.S. 590. Under our Court of Appeals' analysis these activities would be intrinsic to their operations.

The Court of Appeals and the superior court further imply that because Rhod-A-Zalea was not required to obtain a conditional use permit that it should not then be subject to the grading permit requirement. The Court of Appeals states that "Snohomish County cannot regulate indirectly what it has conceded is not regulable directly," *Rhod-A-Zalea*, No. 36658-1-I, slip op. at 2, and that the County was seeking to regulate "through the back door, by applying the building code, that which it cannot regulate through the front door by applying the zoning code . . . ." *Id.* at 4-5. However, just because Rhod-A-Zalea was not required to obtain a general conditional use permit (because it is a valid nonconforming use) does not mean that it is exempt from all other specific permitting requirements, even if they regulate some of the same operations.

This same argument was made and rejected by the Supreme Court in *Goldblatt*. "A successful defense to the imposition of one regulation does not erect a constitutional barrier to all other regulation. The first suit was brought to enforce a zoning ordinance, while the present one is to enforce a safety ordinance." *Goldblatt*, 369 U.S. at 597. Similarly, the fact that Rhod-A-Zalea does not have to obtain a conditional use permit does not operate as a shield to the grading permit requirement.

Rhod-A-Zalea also argues that Snohomish County's zon-

ing provision, which allows the continuance of nonconforming uses, precludes the application of the grading permit provision. It contends that because Snohomish County "has *not chosen* to disfavor nonconforming uses" that their use is not subject to later-enacted police power regulations. Answer to Pet. for Review at 9.

SCC 18.71.010 of the Snohomish County zoning code provides that any nonconforming use may continue "subject to the provisions of this chapter." Focusing on the words "subject to the provisions of this chapter," Rhod-A-Zalea argues that SCC 18.71.010 does not authorize the application of the grading permit requirement contained in SCC 17 to valid nonconforming uses.

Rhod-A-Zalea is incorrect. The zoning code specifically contains a provision which requires compliance with other applicable laws and regulations. SCC 18.13.020 provides:

> Any development or activity regulated herein must also comply with all other requirements of county code and of all applicable laws and regulations administered and enforced by other jurisdictions.

Additionally SCC 18.13.010 states that "[t]he provisions of this title shall be held to be the minimum requirements necessary for the promotion of public health, safety, morals, and general welfare." Only where the provisions of the zoning code impose greater restrictions upon the use of buildings or land than is imposed by other ordinances will the provisions of that Chapter govern. SCC 18.13.010.

Thus, Title 18 of the zoning code directs nonconforming uses to comply with all other applicable regulations and laws.[2]

Finally, we must address the superior court's determina-

---

[2]Rhod-A-Zalea also cites UNIFORM BUILDING CODE section 104 as prohibiting later-enacted police power regulations from applying to nonconforming uses. Section 104(c) provides:

> Buildings in existence at the time of the adoption of this code may have their existing use or occupancy continued, if such use or occupancy was legal at the time of the adoption of this code, provided such continued use is not dangerous to life.

tion that the grading permit requirement violates Rhod-A-Zalea's substantive due process rights. The Court of Appeals specifically declined to address this issue.

■ We find the superior court's decision in this regard was premature as the issue is not ripe for review. A constitutional challenge to a land use regulation is ripe when the developer has received a final decision regarding how the regulation at issue will be applied to the particular land in question. *See Herrington v. County of Sonoma*, 857 F.2d 567 (9th Cir. 1988). Rhod-A-Zalea has not applied for the grading permit and, therefore, this court cannot determine if the ordinance as applied to Rhod-A-Zalea violates its substantive due process rights. *See Guimont v. City of Seattle*, 77 Wn. App. 74, 89, 896 P.2d 70 (1995) (the court could not hear the appellant's substantive due process claim regarding a relocation report requirement because the appellant had not submitted the required report).

Additionally, there has been no argument by Rhod-A-Zalea[3] nor any indication from the record that an attempt to apply for a grading permit would be futile. *See Herrington*, 857 F.2d at 569 ("[a] landowner may avoid the final decision requirement if attempts to comply with that requirement would be futile.").

## CONCLUSION

In conclusion, we find that Rhod-A-Zalea's nonconforming use is subject to the grading permit requirement contained in SCC 17.04.280. Nonconforming uses have *only* a vested right not to have the use immediately terminated in the face of a zoning ordinance which prohibits the use. The case law overwhelmingly holds that nonconforming

UNIFORM BUILDING CODE ch. 1, § 104(c), at 2 (1991). Section 104 of the Building Code, however, relates only to buildings. Since no buildings are at issue in this case, this provision is not relevant.

[3]Rhod-A-Zalea has not argued in its briefs to this court that the grading permit requirement violates its substantive due process rights.

uses are subject to later-enacted reasonable police power regulations. Finding to the contrary would lead to an illogical result whereby disfavored uses would be allowed to continue unabated without having to comply with state and local health and safety regulations. In this case, the grading permit provision is a reasonable regulation enacted to protect the health and safety of the community and there is no indication that complying with the regulation would jeopardize Rhod-A-Zalea's existing peat mining operation. Rhod-A-Zalea, like its conforming counterparts, is subject to the grading permit requirement.

We reverse the superior court's and the Court of Appeals' decisions and reinstate the decision of the Hearing Examiner that Rhod-A-Zalea is subject to the grading permit requirement contained in SCC 17.04.280. Additionally, we reverse the superior court's determination that the grading permit violates Rhod-A-Zalea's substantive due process rights because the issue is not ripe for adjudication.

DURHAM, C.J., and SMITH, GUY, JOHNSON, ALEXANDER, and TALMADGE, JJ., concur.

SANDERS, J. (dissenting) — The majority concedes Rhod-A-Zalea has a valid vested right to continue its peat mining operation as a nonconforming use. Majority at 6. But Snohomish County argues, and the majority concludes, the County seeks not to deny Rhod-A-Zalea its right to mine, but only to properly utilize its local police power prerogative to regulate the manner in which the mining is conducted to protect the public health and safety. Supplemental Br. of Snohomish County at 6; Majority at 19-20.

The Court of Appeals, however, disagreed, writing:

> We cannot improve on the trial court's answer to this argument.
>
> In this instance, application of the grading permit provisions of the county building code constitutes such pervasive regulation of the peat mining operation that it effectively

abrogates Rhod-A-Zalea's vested property rights in maintaining the nonconforming use.

*Rhod-A-Zalea & 35th, Inc. v. Snohomish County*, No. 36658-1-I, slip op. at 6 (Wash. Ct. App. July 22, 1996) (quoting Trial Court's Amended Mem. Decision at 4), *review granted*, 131 Wn.2d 120, 937 P.2d 1102 (1997). Nor can I better the observation of the trial court and would, therefore, affirm the Court of Appeals.

Rhod-A-Zalea seeks neither to expand its nonconforming use nor restart its operation after a hiatus. Rather it seeks to mine peat, an activity that, by the definition adopted by the county, is "grading." *See* Clerk's Papers (CP) at 322 (Snohomish County Decision of the Deputy Hearing Examiner (*hereinafter* "Hearing Examiner") (Sept. 18, 1992)). In the words of the learned trial judge: "[T]he *grading* taking place on the property is not merely an activity component of the mining process. It is the mining process." CP at 41 (Trial Court's Amended Mem. Decision at 5).

The County, as the lower courts discerned, seeks to " 'regulate through the back door, by applying the building code, that which it cannot regulate through the front door by applying the zoning code, due to the existence of a valid nonconforming use.' " *Rhod-A-Zalea & 35th, Inc. v. Snohomish County*, No. 36658-1-I, slip op. at 4-5 (quoting Trial Court's Amended Mem. Decision at 4-5).

The majority opines it would be "counterintuitive to conclude that nonconforming uses which are contrary to public interests, such as health, safety and welfare, would then be exempt from subsequently enacted public health and safety regulations," Majority at 9; noting "[t]he theory of the zoning ordinance is that the nonconforming use is detrimental to some of those public interests (health, safety, morals or welfare) which justify the invoking of the police power," but not immediately. Majority at 7.

The majority seems to say that while the County has no right to immediately prohibit through the zoning (pursuant to the County's police power),[4] it may nevertheless presently invoke its police power to burden Rhod-A-Zalea's protected activity by simply denominating the regulation "grading" rather than zoning.

Such approach ignores the fundamental proposition that "[a] valid nonconforming use carries with it the right to the exercise of those accessory uses which are considered customary and incidental to the principal use." *Ferry v. City of Bellingham*, 41 Wn. App. 839, 844, 706 P.2d 1103, *review denied*, 104 Wn.2d 1027 (1985). In *Ferry* the court found the addition of a crematory to a funeral home (which had a nonconforming use right in a residentially zoned area) *did not* constitute any enlargement of the nonconforming use and, thus, could not be precluded because of a zoning regulation. *Id.* Here, Rhod-A-Zalea seeks nothing more than to continue the very use of the land it has rightly enjoyed for over 30 years.

In an analogous case a rock mining and crushing business was protected in its continuation of its vested nonconforming use without submitting to a permitting requirement that encompassed potential termination of the nonconforming use. *Missouri Rock, Inc. v. Winholtz*, 614 S.W.2d 734, 739-40 (Mo. Ct. App. 1981). The authority to permit implies the power to prohibit.

As the Hearing Examiner noted, "[t]he subject excavation and fill constitutes 'grading' as such term is defined" in the SNOHOMISH COUNTY CODE. CP at 332 (Hearing Examiner at 11, conclusion 20). The subject excavation and fill is, of course, the peat mining. *See* CP at 324 (Hearing Examiner at 3).

The majority drags the red herring of undercooked food across the table where it uses this analogy: "[Rhod-A-Zalea's] reasoning . . . leads to illogical results. For example, a nonconforming restaurant would not be subject

---

[4]*See* 1 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING 3D § 7.03, at 690 (1986).

to subsequently-enacted regulations governing the handling and cooking of meat to prevent E. coli contamination because handling and cooking food is 'intrinsic' to the restaurant business." Majority at 17.

By the majority's reasoning a valid nonconforming restaurant use could, under the guise of a police power regulation, be regulated out of existence, or at least burdened, through the prohibition of stoves, ovens, or normal restaurant fare. Cooking facilities to prepare food are intrinsic to a restaurant; however, service of contaminated food is not. This distinction is the heart of the case.

The distinction is of kind, not degree. Although a regulation banning black pepper might cost that restaurant only one customer a month, such regulation would be most problematic as it strikes at the heart of restauranteering, which is the preparation of wholesome, tasty food. One need not put the restaurant out of business to compromise its vested nonconforming use.

To support the County's asserted right to impose its will upon Rhod-A-Zalea, the majority relies upon the "purpose" of the Uniform Building Code's grading regulations: " 'to safeguard life, limb, property and the public welfare by regulating grading on private property.' " Majority at 14 (quoting UNIFORM BUILDING CODE, ch. 70, § 7001 (1976)). However the UNIFORM BUILDING CODE specifically exempts mining from the grading permit requirements it sets out and, therefore, by its original terms does not purport to justify any regulation whatsoever of peat mining. UNIFORM BUILDING CODE 1-508, app. ch. 33, § 3306.2(6) (1994).[5] However Snohomish County, which adopted much of the UNIFORM BUILDING CODE verbatim (SNOHOMISH COUNTY CODE (SCC) 17.04.010-.330), deleted this exemption (SCC 17.04.280) while retaining the grading permit requirement. Thus the County retains the justification of the original code but imposes a contrary result.

---

[5]The 1994 UNIFORM BUILDING CODE is substantially different from earlier versions in terms of organization, but the relevant content remains effectively the same. The exemption for mining, for example, was present in earlier versions as section 7003(6).

It is illogical on the one hand to rely upon the policy arguments of the UNIFORM BUILDING CODE to support the necessity of the County's regulation while, on the other hand, ignoring the objectives of its drafters. The very first sentence of the UNIFORM BUILDING CODE sets out exactly why its provisions should not apply here: "The *Uniform Building Code* is dedicated to the development of better building construction and greater safety to the public by uniformity in building laws." UNIFORM BUILDING CODE, *Preface* at 1-iii (1994). The grading regulations of the UNIFORM BUILDING CODE are justified as reasonable requirements pertaining to *building*, not *mining*; hence, the exemption for mining makes perfect sense while the application of the code's grading permit requirements to mining makes no sense.

The majority, with near religious fervor, also invokes the spirit of *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 82 S. Ct. 987, 8 L. Ed. 2d 130 (1962), to justify its conclusion that the County may apply its grading permit requirements to Rhod-A-Zalea. *See* Majority at 5, 8, 9, 10, 15, 16, 17. Yet, as one commentator has rightly noted, what *Goldblatt* really does is "underline the difficulty of determining whether a particular regulation, onerous to a user, is an unlawful attempt to destroy the use, or a legitimate means of regulating it." 1 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING 3D § 6.78, at 680 (1986).[6] The majority's flaw is its failure to make the distinction between continuation of a nonconforming use which is exempt from police power regulation on the one hand, and imposition of the police power without exemption, subject only to the usual requirements of due process, on the other. If the latter be the rule, the nonconforming use doctrine is robbed of its reason for existence, and is no more than the usual due process test.

The majority notes courts "have been alert to the pos-

---

[6]The Supreme Court has recently criticized *Goldblatt*, noting that the case assumed that when examining property regulations, the standards for takings challenges, due process challenges, and equal protection challenges are identical. "[T]hat assumption is inconsistent with the formulations of our later cases." *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 835 n.3, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987).

sibility that a municipal corporation may seek to terminate a nonconforming use by the imposition of regulations so onerous as to render further use impractical." Majority at 12-13.[7] And the majority then complains of Rhod-A-Zalea's alleged failure to make any "particularized argument concerning economic impact." *Id.* at 13.[8] Apparently the majority invites the conclusion that it is the degree, not fact, of imposition which is determinative. I disagree.

Placing this requirement of a "particularized argument" upon Rhod-A-Zalea is *exactly* what we should not do. If the regulation is consistent with the vested nonconforming use, it is valid no matter how prohibitory (assuming it satisfies due process); whereas, if it is *inconsistent* with the vested use, it is invalid no matter how slight its burden.

In any case the burden of proof properly rests on the County to establish that its regulation does not burden a vested nonconforming use but rather is a legitimate effort to protect from a recurring harm not incident to the very nature of the nonconforming use. *See State v. Thomasson*, 61 Wn.2d 425, 428, 378 P.2d 441 (1963) (requiring facts that establish a nuisance or "circumstances showing a condition substantially detrimental to the public health, safety, morals or welfare" before a municipality may attempt to abolish existing nonconforming use without violating due process of law). *See also Township of Orion v. Weber*, 83 Mich. App. 712, 269 N.W. 2d 275, 278-79 (1978) (nonconforming vested sand and gravel business not subject to retroactive burdensome regulation).

While the majority requires a "particularized argument" from Rhod-A-Zalea, the majority adopts the opposite view

---

[7]*See also* 1 ANDERSON, *supra*, section 6.06 at 462 (Noting general disapproval of retroactive zoning regulations: "Thus, one court . . . remarked: 'Retroactive legislation is so offensive to the Anglo-Saxon sense of justice that it is never favored.'" (quoting *Appeal of Sawdey*, 369 Pa. 19, 22, 85 A.2d 28 (1951))).

[8]Rhod-A-Zalea did, in fact, argue both the general impact and the specific impact that imposition of the grading permit would have on its operations. *See generally* Resp't's [Rhod-A-Zalea] Br. to the Court of Appeals Division One at 34-38 (discussing due process implications of County's action) and 38-40 (discussing specific damages to Rhod-A-Zalea from imposition of grading permit).

when dealing with the County: "[A] particularized finding of harm is not required for the grading permit to be applicable . . . ." Majority at 15. Nonetheless, the majority, relying on the testimony of the County's enforcement officer and a neighboring property owner (testimony this court did not hear), concludes "it does appear that there are problems concerning current operations on Rhod-A-Zalea's property which would be cured through the application of the grading permit requirements." Majority at 15. The "problem" noted by the majority is the fact that Rhod-A-Zalea replaces peat with other materials. *Id.* This is the nub of the County's complaint. Rhod-A-Zalea is indeed replacing peat with fill, which is to say Rhod-A-Zalea is peat mining. Were it the County's prerogative to "permit" the mining, it would equally be its prerogative to withhold the permit. However the permit could be withheld only at the expense of the protected use.

The trial court and the Court of Appeals correctly discerned the distinction between that which is intrinsic to the privileged use and that which is not. However the majority overlooks it. I therefore dissent.

DOLLIVER, J., concurs with SANDERS, J.

Reconsideration denied November 16, 1998.