9 P.3d 918 (2000)
CITY OF UNIVERSITY PLACE, a municipal corporation, Appellant,
v.
Brian P. McGUIRE, a single man, Respondent.
No. 24829-8-II.
Court of Appeals of Washington, Division 2.
September 22, 2000.
*920 Bourtai Hargrove, Olympia, Timothy X Sullivan, University Pl., for Appellant.
Thomas J. Parkes, William Theodore Lynn, Gordon Thomas Honeywell Et al., Tacoma, for Respondent.
*919 HUNT, A.C.J.
The City of University Place (City) appeals the City Hearing Examiner's reversal of the City's denial of Brian P. McGuire's (McGuire) application for a site development permit. McGuire sought to remove 26,000 cubic yards of material from a 1.4-acre parcel of land adjacent to residential communities built on a larger parcel that a previous owner had used to mine gravel. Although the 1.4-acre parcel and the larger mined parcel had originally been contiguous, they had subsequently been severed by the relocation of a road.
The City argues that the Hearing Examiner erred by (1) ignoring Pierce County and City ordinances and Washington caselaw on establishment and expansion of nonconforming uses; (2) applying the doctrine of diminishing assets to expand a nonconforming use; (3) finding no abandonment of the nonconforming use; and (4) entering findings of fact not supported by substantial evidence. Holding that the nonconforming use was abandoned, we reverse.

FACTS

I. NON-REGULATED MINING1940'S
In the 1940's, the Holroyd Land Company (Holroyd) began surface mining for sand and gravel on an 80-acre parcel of land it owned within the present-day City limits. At the time, no state, county, or municipal law regulated surface mining; thus, the mines were legal uses of the property.
Holroyd's parcel was located mostly northeast of old Bridgeport Way; old Anderson-Pierce Road cut the parcel into a smaller west portion and a larger east portion. Holroyd established surface mines on both sides of Anderson-Pierce Road northeast of Bridgeport Way, near the center of the parcel.
In 1944, Pierce County adopted its first zoning resolution, establishing use districts, including a "COMMERCIAL DISTRICT" for "[m]anufacturing and industry." Regarding nonconforming uses, Resolution 1650 provided:
1. The lawful use of ... land ... existing at the time of the passage of the resolution establishing any zoning district, although such use does not conform to the provisions therein, may be continued, but if such non-conforming use is discontinued for a period of one year, any future use of said ... land ... shall be in conformity with the provisions of said established use district, unless the use, thereof, is issued a *921 permit by the Pierce County Commissioners.
2..... The County Commissioners may, in their discretion, after public hearing, grant special and conditional permits for the extension of a non-conforming use by addition or enlargement of any tract of land partially occupied by such use at the time of the passage of any resolution establishing any use district.
3. Whenever a use district shall be hereafter changed, any then existing non-conforming use may be continued under the same conditions as are provided in paragraphs 1 and 2....
In 1955, Pierce County amended Resolution 1650 to permit the operation of "[q]uarries, sand and gravel pits" in "1-G GENERAL USE DISTRICT[S]" "[o]n sites approved by special permit."
In February 1956, during a public hearing on a zoning proposal affecting Holroyd's parcel,[1] a Pierce County Commissioner told Holroyd's attorney:
In any operations such as Holroyd's or a Nursery, it is not intended that they should be hampered from continuing their operations; if they have property that they purchased for this purpose, they can continue to use it to the extent of their property.

II. SPECIAL COUNTY PERMIT REQUIRED/NONCONFORMING USE-1957
In May 1957, Pierce County again amended Resolution 1650, permitting "[q]uarries, sand and gravel pits" to operate in "3-G GENERAL USE DISTRICT[S]" upon issuance of a special permit. According to McGuire, "It was on that date that the Holroyd surface mines ... became nonconforming uses."[2]

III. DNR SURFACE MINING PERMITS1970
As required by the Surface Mining Act (SMA) of 1970, RCW ch. 78.44, Holroyd applied for two surface mining permits from the Department of Natural Resources (DNR). Holroyd notified DNR it intended to mine 10 acres of the mine located north of Bridgeport Way and west of Anderson-Pierce Road, and 25 to 40 acres of the mine located north of Bridgeport Way and east of Anderson-Pierce Road. Concerning Holroyd's application for the west mine, Pierce County informed DNR in January 1972:
The mining operation being carried on within the subject property is a nonconforming use legally established prior to zoning controls and may continue to operate without a [County] permit subject to the provisions of Article 26 of the Piece County Zoning Code.
In May 1973, Pierce County repeated this statement to DNR with respect to Holroyd's application for the east mine. In early 1973, Holroyd and Pierce County began negotiations to relocate Anderson-Pierce Road and Bridgeport Way.
In July 1974, DNR issued Operating Permit 11017 for Holroyd's east mine; at some unspecified date, DNR issued Operating Permit 10718 for the west mine. Holroyd expanded both mines beyond the permitted limits: The west mine was expanded northward; the east mine was expanded northward and eastward; and mining occurred within the Anderson-Pierce right-of-way, which the City had abandoned in exchange for the anticipated relocation.

*922 IV. SEVERANCE OF 1.4-ACRE PARCEL; CESSATION OF MINING OUTSIDE PERMIT AREA
By 1978, Bridgeport Way had been realigned roughly 200 feet northward, and Anderson-Pierce Road had been realigned 650 feet eastward and renamed 67th Avenue West.

The realignment severed a 1.4-acre southern portion from the bulk of the Holroyd property. Thus, the 1.4-acre parcel was now bounded on the north by Bridgeport Way, and on the east by 67th Avenue West.
Although the east mine had been operating under Permit 11017 on a portion of the Holroyd property now north of realigned Bridgeport Way, Holroyd's earlier application for Permit 11017 did not cover the southern 1.4-acre parcel at issue here. Nor had this southern 1.4-acre portion ever been mined.[3]
As evidenced by aerial photographs taken in 1978, 1985, and 1989, Holroyd continued mining operations to some extent in the east or west pits following road realignment. But *923 in February 1991, DNR ordered Holroyd to cease mining operations outside the area covered by Permit 11017 for the east pit. In March 1991, Holroyd notified DNR that it would cease mining outside the 40 acres "without an appropriate extension of the remaining permit," but that Holroyd would continue mining "a limited area" under Permit 11017 and submit a reclamation plan. But Holroyd obtained no further permits.[4] SUBEQUENTLY, HOLRoyd sold the Property located east of 67th Avenue West, which included portions of the mine covered by Permit 11017.[5]

V. SALE OF PROPERTY TO McGUIRE; DEVELOPMENT
In May 1991, Holroyd and McGuire entered into a "REAL ESTATE PURCHASE AND SALE AGREEMENT" for the remaining property located west of 67th Avenue West, and north and south of Bridgeport Way, including the 1.4-acre parcel.[6] McGuire obtained (1) "preliminary and final plat approval for two single family subdivisions" north of Bridgeport Way; and (2) a conditional use permit for construction of a shopping center (Bridgeport Corners) adjacent to the intersection of Bridgeport Way and 67th Avenue West.
When the January 1993 Final Environmental Impact Statement (FEIS) was prepared, McGuire "did not intend to mine the site." Rather, the FEIS indicated that McGuire proposed to develop the severed 1.4-acre parcel into a professional office complex.
In connection with the shopping center construction north of Bridgeport Way, McGuire had requested a site development permit "to clear, grade and remove approximately 26,000 cubic yards of material from the [1.4-acre parcel]" and "us[e] it for fill on the Bridgeport Corners [shopping center] site."[7] The City denied McGuire's application for "a site development permit to clear, grade and remove gravel" from the 1.4-acre parcel, explaining:
(1) the land is zoned residential and mining is not a permitted use in a residential zone; (2) mining the land would constitute an impermissible expansion of a nonconforming use and a violation of the Pierce County and University Place Zoning Codes; and (3) Mr. McGuire does not have a [DNR] reclamation permit for the land as required by RCW 78.44.081.
The City Hearing Examiner granted McGuire's appeal, contingent upon McGuire's obtaining "appropriate DNR permits," ruling, in part:
2. The nonconforming surface mine extended to the entire Holroyd ownership which included the 1.4[-]acre parcel, and nonconforming use rights to mine the 1.4[-]acre parcel were not lost by the realignment of Bridgeport Way.... The diminishing assets doctrine extends the nonconforming use throughout the parcel to include the 1.4[-]acre parcel....
3. [McGuire] never expressed an intent to abandon his mining rights....
The City sought review in Superior Court under the Land Use Petition Act (LUPA), RCW ch. 36.70C. The Superior Court affirmed the Hearing Examiner, but granted the City's motion for a stay pending appeal.

ANALYSIS
The City advances a variety of theories under which we might reverse the Hearing Examiner's decision. We address only the *924 abandonment theory, which we find dispositive. In so doing, we assume, without holding, that nonconforming mining use rights originally extended to the 1.4-acre parcel. But we hold that Holroyd and McGuire abandoned any nonconforming mining rights they may have had in the 1.4-acre parcel.

I. STANDARDS OF REVIEW
The City asserts it can satisfy three of the six statutory standards for relief under LUPA:
(b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
(c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court; [and]
(d) The land use decision is a clearly erroneous application of the law to the facts[.]
RCW 36.70C.130(1).[8]
Issues raised under subsection (b) are questions of law, reviewed de novo. Regarding (c), substantial evidence is "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." The clearly erroneous test for (d) is whether the court is "left with the definite and firm conviction that a mistake has been committed." Our review is deferential. We view the evidence and any reasonable inferences in the light most favorable to the party that prevailed in the highest forum exercising fact finding authority.

Schofield v. Spokane County, 96 Wash.App. 581, 586, 980 P.2d 277 (1999) (citations omitted). In conducting this review, "[w]e stand in the shoes of the superior court and review the hearing examiner's action de novo on the basis of the administrative record." Girton v. City of Seattle, 97 Wash.App. 360, 363, 983 P.2d 1135 (1999), review denied, 140 Wash.2d 1007, 999 P.2d 1259 (2000).

II. NONCONFORMING USES

A. Establishment
A nonconforming use is a use which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance, although it does not comply with the zoning restrictions applicable to the district in which it is situated. The right to continue a nonconforming use despite a zoning ordinance which prohibits such a use in the area is sometimes referred to as a "protected" or "vested" right. This right, however, refers only to the right not to have the use immediately terminated in the face of a zoning ordinance which prohibits the use.

Rhod-A-Zalea & 35th, Inc. v. Snohomish County, 136 Wash.2d 1, 6, 959 P.2d 1024 (1998) (citations omitted) (emphasis added).

B. Duration
"Although found to be detrimental to important public interests, nonconforming uses are allowed to continue based on the belief that it would be unfair and perhaps unconstitutional to require an immediate cessation of a nonconforming use." Rhod-A-Zalea, 136 Wash.2d at 7, 959 P.2d 1024 (emphasis added). Nonetheless, "[n]onconforming uses are disfavored under the law." Open Door Baptist Church v. Clark County, 140 Wash.2d 143, 150, 995 P.2d 33 (2000).
Because nonconforming uses are detrimental to public interests such as health, safety, morals or welfare, "`[t]he policy of zoning legislation is to phase out a nonconforming use.'" Open Door Baptist Church, 140 Wash.2d at 150, 995 P.2d 33 (quoting Anderson v. Island County, 81 Wash.2d 312, 323, 501 P.2d 594 (1972)); see also Rhod-A-Zalea, 136 Wash.2d at 7, 959 P.2d 1024.

*925 C. Expansion
Generally, "nonconforming status... will not grant the right to significantly change, alter, extend, or enlarge the existing use." Rhod-A-Zalea, 136 Wash.2d at 7, 959 P.2d 1024.[9] Municipalities may enact an ordinance to permit expansion of nonconforming uses upon approval of a board of adjustment or a planning board. But "[a]bsent such an ordinance, a board of adjustment or a planning board is without authority to permit extension of a nonconforming use, unless the user can satisfy the customary requirements for a variance." 1 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING § 6.53, at 606 (3d ed.1986) (footnote omitted).
The right to maintain a nonconforming use does not depend upon ownership or tenancy of the land on which the use is situated. The right attaches to the land itself; it is not personal to the current owner or tenant. Accordingly, a change in the ownership or tenancy of a nonconforming business or structure does not affect the right to continue the nonconforming use.
1 ANDERSON, supra, § 6.40, at 569-70 (footnotes omitted).

D. ABANDONMENT
"[Z]oning ordinances may provide for termination of nonconforming uses by abandonment...." Rhod-A-Zalea, 136 Wash.2d at 7, 959 P.2d 1024. Both parties cite the current abandonment provisions of the Pierce County and City codes,[10] which provide:
Abandoned nonconforming use of a property or structure shall be subject to the following provisions.
1. Discontinuance. Should a nonconforming use of a property or structure be discontinued for more than one year, the use of the property and structure shall be deemed abandoned and shall conform to a use permitted in the zone classification in which it is located.
PIERCE COUNTY, WASH., CODE § 18A.35.130(J) (1999); CITY OF UNIVERSITY PLACE, WASH., MUNICIPAL CODE § 19.35.130(J) (1998).
Often, zoning ordinances are drafted in terms of "discontinuance," rather than "abandonment," to circumvent the requirement of proving intent to abandon a nonconforming use. 8A EUGENE McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS § 25.194, at 76-77 (3d ed.1994). But many courts, including Washington's Supreme Court, "have merged the terms `discontinue' and `abandon' and require proof of an intent to abandon even though the zoning code speaks in terms of a discontinued use or a use discontinued for a specified period of time." Andrew v. King County, 21 Wash.App. 566, 572, 586 P.2d 509 (1978); see, e.g., King County v. High, 36 Wash.2d 580, 582-83, 219 P.2d 118 (1950). See also 83 AM.JUR.2d Zoning and Planning § 687, at 591 (1992); 1 ANDERSON, supra, § 6.68, at 649.[11]
"The primary objective in interpreting a zoning ordinance is to ascertain the legislative intent." State v. Bellingham, 25 Wash.App. 33, 36, 605 P.2d 788 (1979). The drafters of the Pierce County and City ordinances *926 at issue here appear to have merged "discontinuance" into "abandonment." Thus, we follow Division One's pronouncement in Andrew: "`A discontinuance results from the concurrence of an intent to abandon and some overt act or failure to act which carries the implication of abandonment.'" 21 Wash. App. at 572, 586 P.2d 509 (quoting Board of Zoning Adjustment v. Boykin, 265 Ala. 504, 92 So.2d 906, 909 (1957)). But "[w]hen the issue is one of abandonment of a non-conforming use, discontinuance of such use for a period of time in excess of that called for in the zoning ordinance creates a presumption of an intent to abandon." Rayel v. Bridgeton Township Zoning Hearing Bd., 98 Pa. Cmwlth. 455, 511 A.2d 933, 935 (1986). Accord High, 36 Wash.2d at 582, 219 P.2d 118; Andrew, 21 Wash.App. at 572, 586 P.2d 509; Ansley House, Inc. v. City of Atlanta, 260 Ga. 540, 397 S.E.2d 419, 421 (1990).

III. REVIEW OF THE HEARING EXAMINER'S DECISION
In addition to failure to conduct the claimed nonconforming use on a parcel of land, see Rayel, 511 A.2d at 935; High, 36 Wash.2d at 582, 219 P.2d 118, "failure to apply for a license or permit to carry on the nonconforming use" can also give rise to an inference of intent to abandon. 8A McQUILLIN, supra, § 25.193, at 74. Also, a lease or sale of premises for a use different from the nonconforming use may indicate an intent to abandon. 4A NORMAN WILLIAMS, JR. & JOHN M. TAYLOR, AMERICAN LAND PLANNING LAW § 115.12, at 203 (1986).
Contrary to the hearing examiner's decision, we hold that the following facts indicate abandonment of any nonconforming mining use rights for the 1.4-acre parcel. First, and foremost, no part of the 1.4-acre parcel was ever mined by anyone. Although Holroyd mined the eastern pit, with which the 1.4-acre parcel was originally contiguous, the 1.4-acre parcel "was never touched" before or after it was geographically severed from the eastern pit by the "realignment of Bridgeport Way in 1973." Furthermore, McGuire's proposal to remove gravel from the 1.4-acre parcel and use it for fill at other sites did not arise until more than 17 years later.
Second, Holroyd's May 1973 application for a permit to mine the eastern pit did not include the 1.4-acre parcel. Nor was this small, southern parcel ever included in a mandatory surface mining permit and reclamation plan. See Former RCW 78.44.080 (Laws of 1970, ch. 64, § 9), repealed by Laws of 1993, ch. 518, § 39.[12]
Third, sometime around 1991, Holroyd sold the property containing the eastern pit to third-party residential land developers. These purchasers subsequently built "two single family residential subdivisions"; they neither mined the property nor expressed an intent to continue Holroyd's mining operation.
In May 1991, Holroyd included the 1.4-acre parcel in a larger land sale agreement with McGuire,[13] who similarly "never intended to mine the site." Consistently, although the agreement contemplated the removal and sale of timber by McGuire before closing, the agreement said nothing about mining or the removal and sale of gravel. Moreover, the sale was conditioned on McGuire's obtaining approval for residential and commercial development.
We hold that the elements of abandonment of a nonconforming mining use are met here, where the 1.4-parcel was (1) never mined; (2) geographically isolated from any mining operations; (3) not included in any required mining application, permit, or reclamation plan; (4) ignored as a potential mining source for 17 years; and (5) offered for sale for residential and commercial development with no mention of mining uses. Because Holroyd and his successors, including McGuire, thus abandoned any claimed right *927 to continue a preexisting nonconforming mining use on the 1.4-acre parcel, the City properly denied McGuire's application.
We hold that: (1) the Hearing Examiner's decision that McGuire expressed no intent to abandon nonconforming mining rights is a clearly erroneous application of the law, unsupported by the facts; (2) accordingly, the Hearing Examiner erred in reversing the City's denial of the requested mining permit; and (3) the superior court also erred in affirming the Hearing Examiner. We reverse the Hearing Examiner; thus, the City's denial of McGuire's permit application is reinstated.[14]
HOUGHTON, J., and BRIDGEWATER, J., concur.
NOTES
[1] The record does not reveal the nature of the zoning proposal.
[2] The City does not appear to dispute that date. But according to the City's planning department staff report, the 1.4-acre parcel was first zoned in 1962 as "General (G)," which placed "[f]ew [r]estrictions" on uses. Then, in 1990, part of the parcel was zoned "Interim Business (IB)," permitting "Commercial" uses, and the remaining part was zoned "Interim Single-family (ISF-10)." In unchallenged Finding of Fact 18, however, the Hearing Examiner states:

[McGuire's] compelling argument is that the doctrine of diminishing assets authorizes the expansion of a nonconforming surface mine to the property lines of the parcel as determined at the date the mine becomes nonconforming. Thus, [McGuire] argues that since the 1.4[-]acre parcel was a portion of the "mother parcel" in 1956 when the mine became nonconforming, the doctrine of diminishing assets authorizes the mining of said parcel.
(Emphasis added.) But Finding of Fact 18 resembles a conclusion of law, one which is not supported by any factual finding.
[3] As the Hearing Examiner stated in the Findings of Fact:

The 1.4[-]acre parcel was never mined, was never covered by a DNR surface mining permit, was never covered by a reclamation plan, and was never touched following realignment of Bridgeport Way in 1973.
The 1.4[-]acre parcel ... consists of an approximate 30 foot high knoll covered with mature trees and provides a significant buffer to homes south of Chambers Creek Road from the traffic and noise associated with Bridgeport Way and the 67th [Avenue]/Bridgeport intersection.
[4] If Holroyd did submit a reclamation plan, the 1.4-acre parcel "was not a portion of the reclamation plan for either surface mine."
[5] The purchasers constructed two residential subdivisions which "abut the east side of 67th Avenue West and the north side of Bridgeport Way and Leach Creek."
[6] But it was not until January 1997, that Holroyd conveyed the 1.4-acre parcel to McGuire.
[7] In his application to develop a residential subdivision known as "The Quarry," McGuire had apparently also stated: "The related parcels will be graded to provide fill material for the subdivision and adjacent shopping center site." It does not appear from the record that the site development permit had been sought at the time the FEIS was prepared. But development of McGuire's entire interest in the Holroyd property was contemplated in the FEIS.
[8] The other three standards are:

(a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
. . . .
(e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
(f) The land use decision violates the constitutional rights of the party seeking relief.
RCW 36.70C.130(1).
[9] The doctrine of diminishing assets, cited by the Hearing Examiner, is an exception to the rule prohibiting the expansion of nonconforming uses. 1 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING § 6.52, at 604-05 (3d ed.1986). See, e.g., Hansen Bros. Enters., Inc. v. Board of Supervisors of Nevada County, 12 Cal.4th 533, 907 P.2d 1324, 48 Cal.Rptr.2d 778 (1996); Town of Wolfeboro (Planning Bd.) v. Smith, 131 N.H.449, 556 A.2d 755 (1989); Stephan & Sons, Inc. v. Municipality of Anchorage Zoning Bd. of Examiners & Appeals, 685 P.2d 98 (Alaska 1984); Schroeder v. Dane County Bd. of Adjustment, 228 Wis.2d 324, 596 N.W.2d 472 (Ct.App.), review denied, 228 Wis.2d 176, 602 N.W.2d 761 (1999). But in light of our resolution of this case, we need not reach the issue of this doctrine's viability in the State of Washington.
[10] We acknowledge that an earlier version of the Pierce County Code contained a different abandonment provision. But the parties rely solely on the abandonment language contained in the current codes.
[11] "[A] `growing minority' of state courts apply discontinuance provisions according to their plain meaning." County of Isanti v. Peterson, 469 N.W.2d 467, 470 (Minn.Ct.App. 1991) (quoting Hartley v. City of Colorado Springs, 764 P.2d 1216, 1224-25 (Colo. 1988)), overruled on other grounds by Tyroll v. Private Label Chems., Inc., 505 N.W.2d 54 (Minn. 1993).
[12] Operating a surface mine without a valid permit is a gross misdemeanor, punishable as a separate offense for each day of illegal operation. Former RCW 78.44.150 (Laws of 1970, ch. 64, § 16), amended by Laws of 1993, ch. 518, § 34, and recodified at RCW 78.44.260.
[13] "Holroyd sold its property west of 67th Avenue and both north and south of Bridgeport Way to [McGuire].... [The 1.4-acre parcel] was conveyed along with properties west of [the 67th Avenue Bridgeport Way] intersection."
[14] We deny McGuire's request for RCW 4.84.370(1) attorney fees.